## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLORADO

NAOMI PEÑA VILLASANO,

      *Plaintiff,*

v.

GARFIELD COUNTY SCHOOL DISTRICT
16, *et al.*,

      *Defendants.*

CIVIL ACTION NO. 23-cv-01317

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND REQUEST TO ALLOW OUT-OF-STATE COUNSEL TO PARTICIPATE VIRTUALLY IN A HEARING ON THIS MOTION

Plaintiff Naomi Peña Villasano—a high school senior who will graduate this Saturday, May 27, 2023 from Grand Valley High School in Parachute, Colorado—seeks a temporary restraining order to enjoin Defendants from prohibiting her from wearing a sash with her gown that expresses her Mexican American heritage during the school's graduation ceremony.

As further described in the Certificate of Conference and Certificate of Service accompanying this motion, Plaintiff's counsel conferred with counsel for the Garfield County School District 16 in advance of this filing and served that counsel with the complaint in this case. The Garfield County School District 16 opposes the relief sought in this motion.

To represent her Mexican American heritage at her graduation, Naomi sought permission from the Garfield County School District 16 (the "District") to wear a sash displaying the Mexican flag and the American flag. Ex. A-3 (Photo of Naomi Peña Villasano's Sash). Defendants denied Naomi's request despite allowing other forms of cultural sashes during recent graduation ceremonies and, for this graduation, permitting sashes and leis that recognize South Pacific

Islander cultures.  The District has impermissibly restricted Naomi's right to self-expression at Grand Valley High School's graduation ceremony.  Naomi now respectfully moves this Court for a temporary restraining order to ensure that the District does not impinge on her First Amendment right to freedom of speech.

## I.    BACKGROUND

*A. During Past Graduation Ceremonies, the District has Permitted Students to Wear Flags, Sashes, and Additional Items of Cultural or Other Significance Over Their Gowns.*

In recent graduation ceremonies, the District did not restrict the kind of cultural regalia worn by students over their gowns.  For example, during Grand Valley High School's 2021 graduation, students wore cultural sashes or flags as they crossed the stage in front of District officials.  *E.g.*, Ex. B-1 (student wearing Honduran flag); Ex. B-2 (student wearing Mexican flag); Ex. B-3 (student wearing Mexican flag).  Those District officials included Defendant Shore, Defendant McCormick, then-School Board member Kevin Coleman, and then-Superintendent Brad Ray.[1]  Further, at least one of these students continued to wear a flag over his gown after the students threw their caps in the air at the end of the ceremony.  Ex. B-4 (student wearing Mexican flag).

Similarly, during Grand Valley High School's 2022 graduation ceremony, multiple students with cultural regalia over their gowns crossed the stage and received their diplomas in front of District officials, including Defendant McCormick, then-Superintendent Brad Ray, then-

---

[1] *See* GVHS YouTube*, Grand Valley High School 2021 Graduation,* YOUTUBE (May 29, 2021), https://www.youtube.com/watch?v=LD1VUxrOptw (time stamp:  50:52) ("Behind me, Mr. Ray, superintendent of Garfield 16 . . . Dr. Kevin Coleman, Lynn Shore"); *see also* Ex. B-16 (Photo of Board President Lynn J. Shore); Ex. B-15 (Photo of Principal McCormick); Ex. B-18 (Photo of Former Board Member Kevin Coleman); Ex. B-17 (Photo of Former Superintendent Brad Ray).

member of the District's Board of Education Brittany Van Teylingen.[2]  For example, one student wore a sarape-style sash honoring her Hispanic heritage as she walked across the stage.  Ex. B-5 (student wearing sarape-style sash).  Another student wore a ribbon lei made of  dollar bills and further adorned with his name and his graduation year.  Ex. B-6 (student wearing ribbon lei).  In addition, one student wore a money lei with flower-shaped bills as she crossed the graduation stage.  Ex. B-7 (student wearing money lei).  And another student crossed the stage wearing a sash that featured the United States Army logo in recognition of his entry into military service.  Ex. B-8 (student wearing U.S. Army sash).

> B. *The District's Board of Education Policies, Grand Valley High School's Publicly-Available Guidelines and Handbook and Colorado Law Related to Graduation Regalia Do Not Restrict Cultural Regalia at Graduation.*

None of the District's posted policies restricts the use of cultural regalia at graduation.  For example, the Board of Education Policy titled "Graduation Exercises" does not discuss any dress code restrictions for graduation ceremonies.  Ex. B-10 at 1 (Board of Education Policy IKFB).  Similarly, the Board of Education Policy titled "Student Dress Code" does not prohibit wearing flags or cultural regalia in the learning environment.  Ex. B-9 at 1-2 (Board of Education Policy JICA).  The Grand Valley High School 2022-2023 Student Handbook—which contains sections on graduation and dress code requirements—also is silent on the topics of flags and cultural regalia.  Ex. B-12 at 3, 7-8 (Grand Valley High School 2022-2023 Student Handbook).

In advance of the 2023 Grand Valley High School graduation ceremony, the District distributed to students a set of guidelines for decorating graduation caps but offered no guidelines

---

[2]  GVHS YouTube*, Grand Valley High School 2022 Graduation,* YOUTUBE (May 28, 2022), https://www.youtube.com/watch?v=htszTjVIeTY (time stamp:  21:48) ("Joining us on stage today are Superintendent of Schools Mr. Brad Ray . . . School Board Member Brittany Van Teylingen[.]"); *see also* Ex. B-15 (Photo of Principal McCormick); Ex. B-17 (Photo of Former Superintendent Brad Ray); Ex. B-19 (Photo of Former Board Member Van Teylingen).

or rules with respect to wearing sashes or other regalia over the graduation robe.  Ex. A-1 at 1 (Grand Valley High School Graduation Cap Policy).  The graduation cap guidelines offer examples of permissible ways to decorate a graduation cap:

- "thank[ing] a parent, grandparent, teacher, or friend,"

- "recogniz[ing] the university [the student will] attend,"

- stating the student's graduation year,

- noting "the branch of the military [a student] will join[]," or

- including "a flag of a country as recognized by the United Nations."

*Id.*

The graduation cap guidelines prohibit only decorations that:

- "[r]efer to drugs or controlled substances, tobacco, alcohol, or weapons or be of a sexual nature"

- "denote an affiliation with gangs or which advocate drug use, violence, illegal activity, or disruptive behavior"

- "include numbers other than the graduation year"

- or are "obscene, profane, vulgar, or lewd or threaten the safety and welfare of any person"

*Id.*

In addition, Colorado law requires school districts to adopt a policy "to ensure that the right of school district . . . students to display reasonably the flag of the United States shall not be infringed with respect to the display" "[o]n an individual's person."  Colo. Rev. Stat. §  22-32-109(1)(ii).  In accordance with that statute, the District has issued a Board of Education Policy titled "Flag Displays" which states, in relevant part:  "students have the right to reasonably display the flag of the United States on their own person, personal property, and/or property under their temporary control, such as a desk or locker."  Ex. B-11 at 1 (Board of Education Policy IMDB).

   C.  *Naomi Sought Permission to Wear a Sash to Express her Mexican American Culture at Grand Valley High School's 2023 Graduation Ceremony.*

In early April 2023, with her graduation approaching, Naomi—a Mexican American student—grew interested in expressing her cultural identity during the ceremony. At the end of March 2023, during her advisory class, Naomi discussed with another Latino student the possibility of wearing a sash to reflect their Latino heritage. Ex. A ¶ 5 (Declaration of Naomi Peña Villasano). However, when their homeroom teacher overheard Naomi's conversation he informed them that such a sash was prohibited by the school principal. *Id.*

Naomi then sought clarification from other school personnel about the District's policy regarding cultural regalia. *Id.* ¶ 7. On April 6, 2023, Naomi spoke to the school secretary, who informed Naomi that she could not wear a sash expressing her Mexican American culture. *Id.* During that conversation, the school secretary stated that a sarape-style sash would "open too many doors," and suggested to Naomi that she instead wear a money lei during the graduation. *Id.*

The next day, Principal McCormick spoke to Naomi's sister-in-law by phone and affirmed that Naomi would be prohibited from wearing a sarape-style sash at graduation. *Id.* ¶¶ 8-9. Principal McCormick offered to connect Naomi and her family with Defendant Jennifer Baugh, the superintendent of Grand Valley High School, to discuss the District's decision further. *Id.*

   D.  *Superintendent Baugh Informed Naomi that the District Permits Some Cultural Regalia—Including Some Sashes—but Denied Naomi's Request to Wear her Sash.*

On April 13, 2023, Superintendent Baugh emailed Naomi regarding the District's decision to deny Naomi permission to wear her sash. Ex. A-2 at 1 (April 13, 2023 Emails with Superintendent Baugh). In her email, Superintendent Baugh noted that the District has "recognized if a student is going into military service," and that the District permits "any regalia that is part of a Native American or Pacific Islander tribe." *Id.*

Superintendent Baugh also noted that the purpose of the restriction on the use of other cultural regalia was to prevent students from wearing one of "at least three flags that would be offensive to people because of what they represent in past and current history.  While these flags are not currently countries, there are people who identify with that national identity."  *Id.*  Superintendent Baugh also stated that, "if we allowed students to wear a pin with a country's flag, then we would have to allow any students to wear a pin with a flag of their country's nationality. The practice has been to not allow this[.]"  Superintendent Baugh explained that in order to avoid opening the door to a student wearing a Confederate flag pin or another flag that would cause offense, the District did not permit the wearing of flags at graduation, including, for example, "a Ukrainian flag pin."  *Id.*  Having declined Naomi's request, Superintendent Baugh instead offered to discuss how to "recognize this accomplishment in a way that doesn't create a set of other issues." *Id.*

On April 26, 2023, Superintendent Baugh was quoted in the *Post Independent* saying that Naomi will be asked to "remove [the sash]" in the event that she wears it to her graduation ceremony.  Ex.  B-14  (April  27,  2023  *Post  Independent*  Article,  available  at https://www.postindependent.com/news/grand-valley-high-school-student-barred-from-wearing-mexican-flag-sash-at-upcoming-graduation-ceremony/).

Naomi and Superintendent Baugh then arranged for an in-person meeting on May 3, 2023 to discuss further Naomi's wish to wear her sash at graduation.  *See* Ex. A-4 at 1 (April 27, 2023 Email from Superintendent Baugh).  During that meeting, Superintendent Baugh stated that students could wear money leis during graduation, and explained that wearing a money lei was "different" because the ACLU had advocated for a change with respect to Native Americans and Pacific Islanders.  Ex. A ¶ 13 (Declaration of Naomi Peña Villasano).  Superintendent Baugh said

that the lei made of money represents good luck for Pacific Islanders and that the District had to allow money leis at the graduation ceremony. Superintendent Baugh stated that wearing a tribal headdress or other similar garment is also permitted. *Id.* Superintendent Baugh again did not grant permission to Naomi to wear her sash. *Id.*

>    E. *The District Reiterated That It Would Prohibit Naomi From Wearing her Sash at graduation.*

On May 5, 2023 Colorado Public Radio reported that the District issued a statement saying that "Students are provided with guidelines and suggestions for decorating their mortar boards, and nothing prohibits a student from including a flag that represents their heritage and nationality." Ex. B-13 at 6 (May 5, 2023 Colorado Public Radio Story, available at: https://www.cpr.org/2023/05/05/grand-valley-student-mexican-flag-graduation-sash/). The District also stated that "we believe our rules promote unity among our graduates." *Id.*

On May 9, 2023, Superintendent Baugh again met with Naomi. Ex. A ¶ 14 (Declaration of Naomi Peña Villasano). The president of the District's Board of Education—Defendant Shore—also joined the meeting. *Id.* During that meeting, Superintendent Baugh and President Shore acknowledged that the District's prohibition on Naomi's sash was not included in the Grand Valley High School student handbook or on the Board's policies posted on its website. *Id.*

On May 16, 2023, the District's Board of Education held its regular public meeting, and at the end of that meeting, President Shore issued a statement regarding its decision to prohibit Naomi's sash. In that statement, President Shore stated, "The district believes there is not adequate time to properly consider changes to its rules and traditions prior to graduation, so the current rules

and traditions will be in effect and fully enforced."[3]  However, President Shore also acknowledged that, "[b]ecause the issues raised have merit, and it is time to review the rules and traditions around our graduation ceremony, these will be reviewed during the 23-24 school year."[4]

The District has made clear that it will infringe on Naomi's right to express herself at her graduation ceremony this Saturday, and she now seeks relief from the Court to protect that right.

## II.   LEGAL STANDARD

To determine whether to grant a temporary restraining order, the Court must analyze:  "(1) whether the movant has a substantial likelihood of success on the merits; (2) whether irreparable harm will ensue if the request for a TRO is denied; (3) whether the threatened injury outweighs the harm that the TRO may cause the [defendants]; and (4) whether, if issued, the TRO will not adversely affect the public interest." *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1291 (D. Colo. 2020) (*citing General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)).

"In cases in which the deprivation of constitutional rights is at issue, the likelihood of the success on the merits factor is determinative." *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1291 (D. Colo. 2020) (citing *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)).  Because the District has infringed on Naomi's First Amendment and Colorado constitutional right to freedom of speech, and the remaining factors likewise favor Naomi, the Court should issue a temporary restraining order.

## III.   ARGUMENT

### A.  Naomi is Substantially Likely to Succeed on the Merits.

---

[3]  Recording of May 16, 2023 Board of Education Meeting, accessible at https://www.garfield16.org/documents/district/board-of-education/meeting-podcasts/267127 (time stamp:  1:30:28).

[4]  *Id.* (time stamp:  1:30:42).

    1.  *The District Has Violated Naomi's First Amendment Right to Freedom of Speech by Prohibiting her Private Student Speech.*

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  In the Tenth Circuit, "[r]estrictions on student speech in public schools are analyzed under one of two standards." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 35–36 (10th Cir. 2013).   School-sponsored speech—that is, "student speech that a school 'affirmatively promotes,' as opposed to speech that it 'tolerates,'" *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 923 (10th Cir. 2002) (cleaned up) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988))—may be restricted only where "the restrictions 'are reasonably related to legitimate pedagogical concerns,'" *Taylor*, 713 F.3d at 36 (quoting *Hazelwood*, 484 U.S. at 273).   On the other hand, private student speech—that is, student speech that is *not* school sponsored—may be restricted only where "the school reasonably forecasted that the speech would cause substantial disruption to the school environment." *Taylor*, 713 F.3d at 36 (citing *Tinker*, 393 U.S. at 509).  To determine whether student speech is school sponsored, courts must analyze whether "'students, parents, and members of the public might reasonably perceive [the speech] to bear the imprimatur of the school." *Id.* (quoting *Morse v. Frederick*, 551 U.S. 393, 405 (2007)).

As explained below, Naomi's sash constitutes private student speech.  But regardless of the type of speech, the District's prohibition violates Naomi's First Amendment right to freedom of speech.

    a.  *The District Has Impermissibly Restricted Naomi's Private Student Speech.*

    i.  *Naomi's Sash is Private Student Speech.*

Naomi's sash constitutes private speech because "[n]o one would reasonably believe" her sash "[bears] the school's imprimatur." *Taylor*, 713 F.3d at 36 (quoting *Morse*, 551 U.S. at 405).

The imprimatur concept covers only "speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1228 (10th Cir. 2009) (quoting *Fleming*, 298 F.3d at 925). To determine whether speech "bears the imprimatur of the school, a reviewing court should appraise the level of involvement the school had in organizing or supervising *the contested speech*." *Corder*, 566 F.3d at 1228 (emphasis added); *see also Fleming*, 298 F.3d at 930 ("When coupled with organizing, supervising, approving the funding, and screening the tiles, the school's decision permanently to mount them on the walls conveys a level of approval of the message.").

As the Tenth Circuit has emphasized, "certain expressive activities may be closely tied to a school, yet not school-sponsored speech bearing the school's imprimatur." *Id.* Indeed, "*Hazelwood* acknowledges that private expression, over which *Tinker* governs, often occurs on school grounds." *M.C. Through Chudley v. Shawnee Mission Unified Sch. Dist. No. 512*, 363 F. Supp. 3d 1182, 1199–200 (D. Kan. 2019) (citing *Hazelwood*, 484 U.S. at 271).

The District affords students wide latitude for self-expression at the high school graduation ceremony—and thus the various ways in which students wear and decorate their regalia is not school-sponsored speech. Students have significant discretion to personalize their graduation caps. *See* Ex. A-1 (Grand Valley High School Graduation Cap Policy). And the District permits a wide range of regalia on students' gowns, from representing "membership to nationally recognized organizations . . . that operate in high schools across the country," to celebrating "other distinctions such as class rank, to noting "if a student is going into military service," to permitting regalia reflecting that a student "is part of a Native American or Pacific Islander tribe." Ex. A-2 (April 13, 2023 Emails with Superintendent Baugh). Further, the District plays no role in providing guidelines for that cultural regalia that it does permit.

10

As such, Naomi's sash is *not* school-sponsored speech because the District does not exercise the degree of control over Naomi's sash such as to confer the imprimatur of the District. *Corder* is particularly instructive for analyzing student speech at graduation ceremonies. In *Corder*, the Tenth Circuit considered a high school's discipline of one of its students based on the content of her valedictory speech during her graduation ceremony, in which she discussed her religious views without the prior approval of the principal. 566 F.3d at 1222-23. The Tenth Circuit noted that the student had "'qualified' as a valedictorian," "that the valedictorians were instructed by the principal on how to organize their speech," "that the principal required the valedictorians to submit their speeches to him for review for content," that the student "was escorted by a teacher to see the assistant principal after the conclusion of the graduation ceremony," and that "[t]he school limited the giving of speeches to the valedictorians, who were chosen because of their 4.0 grade point average." *Id.* at 1229 (quotation omitted). According to the Tenth Circuit, "[a] high school graduation ceremony under these circumstances is 'so closely connected to the school that it appears the school is somehow sponsoring the speech.'" *Id.* Thus, "on those facts"—and in particular, "where the School District exercised control over valedictory speeches in advance of graduation, and named valedictory speakers based on the School District's qualifications"—the school district was permitted to exercise editorial control under the school-sponsored-speech framework over the valedictory speech. *Id.*

Of note, the Tenth Circuit contrasted the facts in *Corder* with those in *Adler v. Duval County School Board*, 250 F.3d 1330 (11th Cir. 2001), in which the Eleventh Circuit held that a student's speech at graduation constituted private student speech. Unlike the facts in *Corder*, the Tenth Circuit emphasized, the speech at issue in *Adler* "was from a student not chosen by the school and over whom the school exercised no editorial control." *Corder*, at 566 F.3d at 1229 n.5.

Here, unlike in *Corder*, the District here has not named Naomi as one of a selected group of speakers during the ceremony, and the District has not required her to submit her "speech" for review. *Id.* at 1229. Further, Naomi did not receive her sash from the District. *See Taylor*, 713 F.3d at 36 (holding that distribution of rubber fetus dolls on school grounds by students obtained from their church youth group constituted private student speech). Indeed, the District has repeatedly—and publicly—"disclaimed any endorsement or sponsorship" of cultural regalia. *M.C.*, 363 F. Supp. at 1199, 1200 (concluding that speech was private student speech where District "made clear to parents and students" that speech "[was] student-led and optional").

Indeed, the District's affirmative decision to permit students to add almost unfettered decorations on their graduation caps, as well as its decision to permit personalized leis and tribal regalia, deprives those forms of expression of the school's imprimatur. As such, Naomi's speech is unlike the valedictory speech in *Corder*; instead, it is akin to the black armbands worn by students on school grounds or at a school function—and therefore subject to the *Tinker* private-speech framework. *See Williams v. Eaton*, 443 F.2d 422, 430-32 (10th Cir. 1971) (holding that, under *Tinker*, college football players had free speech right during a game to wear black armbands to protest the racial policies of the other team's school).[5] Thus, because of the lack of the District's involvement in Naomi's sash, Naomi's wearing of her sash constitutes private student speech, and the District's restriction must be analyzed under the *Tinker* framework.

       ii. *The District Has Not Reasonably Forecasted that Naomi's Speech Will Cause Substantial Disruption to the School Environment.*

The District has not reasonably forecasted any potential disruption from Naomi's sash. "For a school's forecast to be reasonable, courts generally require that it be based on a 'concrete

---

[5] Although *Williams* preceded the Tenth Circuit's decision in *Fleming* distinguishing the private speech and school-sponsored speech analytical frameworks, since *Fleming*, the Tenth Circuit has not disavowed the use of the former framework to the facts in *Williams*. *See Taylor*, 713 F.3d at 36.

threat' of substantial disruption."  *Taylor*, 713 F.3d at 36.  Of note, "[o]fficials may not restrict speech based on 'undifferentiated fear or apprehension of disturbance.'"  *Id.* at 37 (quoting *Tinker*, 393 U.S. at 508-09).  Accordingly, "[s]eeking to avoid controversy, without more, is insufficient to demonstrate a material or substantial threat of disruption."  *M.C.*, 363 F. Supp. 3d at 1201 (citing *Tinker*, 303 U.S. at 509-10).

At most, the District has articulated a concern that allowing Naomi to wear her sash at graduation would in turn require the District to permit "at least three flags that would be offensive to people because of what they represent in past and current history."  Ex. A-2 at 1 (April 13, 2023 Email from Superintendent Baugh).  The District did not explain which two flags, in addition to the Confederate flag, would be offensive, or how permitting the offensive flags was likely to disrupt graduation.  Most important, the District did not explain, in light of the fact that it allows students to decorate their graduation caps with offensive messages, how a sash was any more likely than a graduation cap to cause a disruption.  Ex. A-1 at 1 (Grand Valley High School Graduation Cap Policy).  The District's rule expresses nothing more than undifferentiated fear or apprehension of disturbance.  *See M.C.*, 363 F. Supp. 3d at 1201 (concluding school's forecast was not reasonable where "no alleged facts suggest the District considered the [speech] a safety risk beforehand, nor that it feared student expression . . . would incite violence or disruption among the students").  Given that some graduating seniors in 2021 and 2022 wore cultural regalia over their gowns without incident, the District can point to no disruption that is likely to occur.  *Cf. West v. Derby Unified School District*, 203 F.3d 1358, 1365 (10th Cir. 2000) (upholding school policy prohibiting display of Confederate flag due to past racial tension in the school that was associated with display of the flag).  Thus, "[s]uch an 'urgent wish to avoid . . . controversy,' standing alone,"

does not justify the District's restriction of Naomi's speech.  *M.C.*, 363 F. Supp. 3d at 1202 (quoting *Tinker*, 393 U.S. at 510).

> iii.  *The District's Decision Impermissibly Restricts Naomi's Speech Based on its Viewpoint.*

Independent from the reasonably forecasted requirement, private student speech must be regulated "in a viewpoint-neutral manner."  *Taylor*, 713 F.3d at 46; *see also Fleming*, 298 F.3d at 926.  "A restriction is viewpoint-based if it 'denies access to a speaker solely to suppress the point of view [she] espouses on an otherwise includible subject.'"  *Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787, at *2 (10th Cir. Dec. 27, 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

Here, the District has discriminated based on the viewpoint of Naomi's speech by allowing some expressive sashes while prohibiting hers.  Specifically, the District expressly permits Pacific Islander cultural regalia, as well as sashes that celebrate military enlistment.  Ex. A-2 at 1 (April 13, 2023 Emails with Superintendent Baugh).  The District rule which prohibits Naomi from wearing her sash is based on the rationale that allowing flags, and not other messages, would create controversy that the District wants to avoid.  *Id.*  Thus, the District permits South Pacific Islander traditional leis, and money leis, but does not permit Naomi's sash adorned with the American flag and the Mexican flag.

Further, Colorado law and District board policy require that students be allowed to wear a U.S. flag "on their person" in educational settings.  *See* Colo. Rev. Stat. § 22-32-109(1)(ii); Ex. B-11 at 1 (Board of Education Policy IMDB (Flag Displays)).  Thus, in prohibiting Naomi's Mexican American sash while permitting other cultural and patriotic expression, the District has discriminated on the basis of Naomi's viewpoint.  *See Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1163 (9th Cir. 2022) (allegation that student "was prohibited from expressing her religious

message on her graduation cap" while "other students in the school district were not prohibiting from adorning their caps with stickers expressing other viewpoints" sufficiently supports claim of viewpoint and content discrimination).

To the extent that the Court applies strict scrutiny analysis, the District cannot show that its restrictions are narrowly tailored to serve any compelling state interest. *See Reed*, 576 U.S. at 163. The District offered a few potential interests to justify its prohibition of Naomi's speech— promoting unity, honoring tradition, and avoiding controversy—but none of those interests is a *compelling* one. And in any event, the District's restriction is not narrowly tailored to any of those interests. Regarding the interest of avoiding controversy, the District cannot show that the restriction "alleviates in a direct and material way a real, non-speculative harm," for the reasons articulated above in Section III.A.1.a.ii. *See Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021). Moreover, the District has "failed to even *consider* alternative measures that restrict or burden the speech at issue *less severely* than does the" current restriction, *id.*, especially in light of the District's articulation that there are particular flags that the District believes "would be offensive," Ex. A-2 at 1 (April 13, 2023 Email from Superintendent Baugh). Moreover, given the variety of regalia already permitted by the District, the restriction on cultural regalia "will not actually increase" the promotion of unity and the honoring of tradition "in any meaningful way," and that lack of meaningful impact "go[es] to the heart of the narrow tailoring argument." *Martin v. City of Albuquerque*, 396 F. Supp. 3d 1008, 1031 (D.N.M. 2019), *aff'd sub nom. Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021); *see also infra*, Section III.A.1.b. Thus, the District has impermissibly discriminated against Naomi based on the viewpoint of her speech.

> b. *Even If Naomi's Sash Constitutes School-Sponsored Speech, the District Has Violated Her Right to Freedom of Speech Because the Prohibition Is Not Reasonably Related to Legitimate Pedagogical Concerns.*

The District's restriction on Naomi's speech is not reasonably related to the District's articulated concerns of promoting unity, honoring tradition, and avoiding controversy, and thus the restriction is not reasonably related to legitimate pedagogical concerns.

*Griffith v. Caney Valley Public Schools* provides an informative contrast to the facts here. No. 15-CV-273-GKF-FHM, 2015 WL 2451226 (N.D. Okla. May 21, 2015). In that case, a graduating senior who was a member of the Delaware Tribe and Cherokee Nation sought to attach an eagle feather to her graduation cap during her graduation ceremony. *Id.* at *1. The *Griffith* court concluded that the school's prohibition of her eagle feather was reasonably related "to a legitimate pedagogical interest in maintaining the formality of the graduation ceremony and in demonstrating the unity of the graduating class." *Id.* at *5. In reaching its conclusion that the restriction was reasonably related, the *Griffith* court emphasized that: (1) other permissible "regalia [were] permitted" only "to allow recognition of the students' accomplishments in school-sponsored activities" such as stoles from the National Honor Society; (2) none of "these permitted variances to the graduation regalia [were] worn on the cap" (where the plaintiff sought to wear the eagle feather); and (3) "the graduation caps [were] the most visible aspect of the graduation regalia to members of the audiences." *Id.* at *3.

None of those circumstances are present here. First, the District permits not only graduation regalia signifying school-sponsored activities and class rank, but also regalia representing "nationally recognized organization[s] . . . that operate in high schools across the country," "recogniz[ing] if a student is going into military service," and recognizing a student's "Native American or Pacific Islander" heritage. Ex. A-2 at 1 (April 13, 2023 Emails with Superintendent Baugh). The District's cap decoration policy permits students to adorn their caps with all manner of messages, including but not limited to messages that "[t]hank a parent,

grandparent, teacher, friend"; "[r]ecognize the university you will be attending"; state "your graduation year"; indicate the branch of the military you will be joining"; or include the "flag of a country as recognized by the United Nations." Ex. A-1 at 1 (Grand Valley High School Graduation Cap Policy). The District's policy also allows students to display offensive messages or symbols on their caps as long as the messages are not related to drugs, gangs, crime, obscenity, harm to others, or "numbers other than the graduation year." *Id.*

Second, several of the District's "permitted variances to the graduation regalia are worn" over students' gowns, where Naomi seeks to wear her sash, as well as on their mortar boards. *See Griffith*, 2015 WL 2451226, at *3. Third, laying close to her Grand Valley High School graduation robe, and with the audience facing the backs of the graduating students, Naomi's sash will not be "the most visible aspect of the graduation regalia to members of the audiences." *Griffith*, 2015 WL 2451226, at *3.

Given the variety of regalia—including the variety of cultural and individually decorated regalia—already permitted by the District, a prohibition on Naomi's sash is in no way "reasonably related to" the "legitimate pedagogical concerns" of unity and tradition. *Taylor*, 713 F.3d at 36 (quoting *Hazelwood*, 484 U.S. at 273). Indeed, courts have typically upheld restrictions on cultural regalia at graduation only where there was already significant existing uniformity among the graduation wardrobe. *See Griffith*, 2015 WL 2451226, at *3 ("The school's policy prohibiting *individual decorations* of the graduation cap is thus a rational means of displaying the unity of the graduating class." (emphasis added)); *Bear v. Fleming*, 714 F. Supp. 2d 972, 990 (D.S.D. 2010) ("The school board is requiring *all seniors* to wear their cap and gown over their traditional Lakota clothing[.]" (emphasis added)). That uniformity is not present here.

Moreover, the District has undercut any purported reasonableness of the policy by acknowledging that "the issues raised [by Naomi] have merit, and it is time to review the rules and traditions around [the District's] graduation ceremony." [6]  And to the extent that the District seeks to avoid controversy through its restriction, the District already permits the use of flags and other cultural regalia on students' caps during the graduation ceremony (as well as offensive messaging that conforms to the cap decoration guidelines), in addition to the limited cultural regalia permitted over students' gowns.  Ex. A-1 at 1 (Grand Valley High School Graduation Cap Policy); Ex. A-2 at 1 (April 13, 2023 Emails with Superintendent Baugh).  Accordingly, because the District cannot show that the prohibition of Naomi's sash is reasonably related to any legitimate pedagogical concern, the District has violated Naomi's First Amendment right to freedom of speech.

2.  *The District Has Violated Naomi's Right to Freedom of Speech Under the Colorado Constitution.*

Article II, Section 10 of the Colorado constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject."  Colo. Const. art. II, § 10.  Colorado courts have emphasized that Article II, Section 10 "provides greater protection of free speech than does the First Amendment[.]"  *Lewis v. Colorado Rockies Baseball Club, Ltd.*, 941 P.2d 266, 271 (Colo. 1997); *People v. Iannicelli*, 454 P.3d 314, 320 n.7, *aff'd on other grounds*, 449 P.3d 387 (Colo. App. 2017).  Indeed, Article II, Section 10 "goes beyond the prohibition on governmental interference with speech contained in the First Amendment to include an affirmative declaration that Colorado citizens "*shall* be free to speak, write or publish[.]"  *Denver Pub. Co. v. City of Aurora*, 896 P.2d 306, 309 n.4 (Colo. 1995) (quotations omitted).  The Supreme Court of Colorado in turn emphasized "Colorado's

---

[6] Recording of May 16, 2023 Board of Education Meeting, accessible at
https://www.garfield16.org/documents/district/board-of-education/meeting-podcasts/267127 (time stamp:  1:30:42)

'tradition of ensuring a broader liberty of speech,' particularly when freedom to express political views is suppressed." *Id.* Accordingly, "the level of scrutiny required to safeguard the broader free speech protections afforded by Article II, Section 10 of the Colorado Constitution [is] necessarily *more stringent* than that associated with First Amendment analysis.'" *Browne v. City of Grand Junction*, 136 F. Supp. 3d 1276, 1294 n.9 (D. Colo. 2015) (quoting *Denver Pub. Co.*, 896 P.2d at 323) (emphasis added).

For the reasons expressed above in Section III.A.1.a, Naomi's sash constitutes private student speech that the District has improperly restricted under Article II, Section 10 of the Colorado Constitution—consistent with the greater protections of that provision. *See id.* (noting that, "because the challenged" restrictions "cannot withstand" the "scrutiny as required by the First Amendment, they necessarily cannot withstand the more stringent scrutiny required by Article II, Section 10 of the Colorado Constitution"). Likewise, were the Court to consider Naomi's sash school-sponsored speech, the District has improperly restricted her speech for the reasons articulated above in Section III.A.1.b.

In addition, even if the sash constitutes school-sponsored speech, the District has impermissibly discriminated against Naomi's speech because its restriction is viewpoint based. Consistent with the broader free speech protections under the Colorado constitution, Colorado courts have not adopted the Tenth Circuit's interpretation of *Hazelwood*—namely, that school districts may "make viewpoint-based decisions about school-sponsored speech" under the First Amendment, *see Fleming*, 298 F.3d at 926—in applying Article II, Section 10. Instead, with respect to Article II, Section 10, Colorado courts have long emphasized that, "[w]ith *narrow* exceptions in areas such as obscenity, viewpoint discrimination is almost universally condemned

and rarely passes constitutional scrutiny." *Holliday v. Reg'l Transp. Dist.*, 43 P.3d 676, 683 (Colo. App. 2001) (emphasis added).

As such, and consistent with the broader protections for school-sponsored speech under the First Amendment recognized by other circuits, the District's policy may not discriminate based on "the 'viewpoint' of the speaker" regardless of whether the student speech is private or school sponsored. *See Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022). Thus, for the reasons articulated above in Section III.A.1.a.ii, under this "necessarily more stringent" standard for school-sponsored speech, *Browne*, 136 F. Supp. 3d at 1294 n.9 (quoting *Denver Pub. Co.*, 896 P.2d at 323), the District has infringed on Naomi's speech by engaging in viewpoint discrimination.

### 3. *Defendants Have Violated Colorado Revised Statutes § 22-32-109(1)(ii).*

Colorado law requires that a school district "adopt a policy within ninety days after April 28, 2006, to ensure that the right of . . . students to display reasonably the flag of the United States shall not be infringed with respect to the display" "[o]n an individual's person." Colo. Rev. Stat. § 22-32-109(1)(ii). Although the District has posted such a policy, Ex. B-11 at 1 (Board of Education Policy IMDB(Flag Displays)), the District currently maintains a rule prohibiting the display of the United States flag on Naomi's sash at the graduation ceremony.

Naomi's sash depicts the United States flag, Ex. A-3 (Photo of Naomi Peña Villasano's Sash), and her display of the flag on her person at her graduation ceremony is more than reasonable. Because Colorado law prohibits a school district from infringing on Naomi's right "to display reasonably the flag of the United States," and the District has done just that here, Naomi is likely to succeed on her claim under Colorado Revised Statutes § 22-32-109(1)(ii).

**B.  Naomi Will be Irreparably Harmed by the District's Decision to Chill her Speech.**

The second TRO factor strongly weighs in Naomi's favor.  "The Supreme Court has instructed that [t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Given that Naomi's graduation is this Saturday, "[i]f immediate relief is not granted," Naomi's "speech would be chilled and outright denied." *Abay*, 445 F. Supp. 3d at 1293.  High school graduation happens once.  If Naomi must choose between losing her ability to express her culture and losing the opportunity to cross the graduation stage and receive her diploma in front of her family and community, she will be irreparably harmed.  As such, Naomi has more than demonstrated the threat of irreparable injury.

**C.  The Threatened Harm to Naomi Strongly Outweighs the Harm a Temporary Restraining Order May Cause Defendants.**

The third TRO factor likewise strongly favors Naomi.  "When a constitutional right hangs in the balance, 'even a temporary loss' usually trumps any harm to the defendant."  *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) (quotation omitted).  As described in Section III.B above, Naomi will suffer irreparable harm if she loses the ability to express her culture or must forgo her high school graduation ceremony.  On the other hand, Defendants have "no interest in keeping an unconstitutional [policy] on the books." *Id.*  In addition, Defendants have pointed to no potential disruption that would result from Naomi's speech, *see supra*, Section III.A.1.a.iii, and they cannot show how a temporary restraining order will impinge on the District's goals of unity, tradition, and avoiding controversy during the graduation ceremony, *see supra*, Section III.A.1.b.  As such, "[t]he unlikelihood of" any "harm to

[Defendants] is outweighed by the very real harm that" will be caused to Naomi.  *Abay*, 445 F. Supp. 3d at 1293.

> **D.  A Temporary Restraining Order Is in the Public Interest.**

The fourth and final TRO factor also strongly favors Naomi.  "The Tenth Circuit has recognized that 'it is always in the public interest to prevent the violation of a party's constitutional rights.'"  *Abay*, 445 F. Supp. 3d at 1293 (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)).  Indeed, the Tenth Circuit has emphasized specifically that "[v]indicating First Amendment freedoms is clearly in the public interest." *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005)).  As such, "[e]ven where individuals' constitutional rights come into conflict with other important values or public objectives, the Tenth Circuit has held that those other values must yield to the protections of individuals." *Abay*, 445 F. Supp. 3d at 1293.  Because the District's actions have violated Naomi's right to freedom of speech under the First Amendment and Colorado Constitution, the public interest weighs in favor of issuing a temporary restraining order.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion for a temporary restraining order.

Dated: May 24, 2023                                    Respectfully submitted,

                                                      /s/ Jennifer H. Weddle
                                                      Jennifer H. Weddle, Co. Bar No. 32068
                                                      Greenberg Traurig, LLP
                                                      1144 15th Street, Suite 3300
                                                      Denver, Colorado 80202
                                                      (303) 572-6565
                                                      weddlej@gtlaw.com

*/s/* Kenneth Parreno
Nina Perales*
Fátima Menendez*
Kenneth Parreno*
Mexican American Legal Defense and
Educational Fund (MALDEF)
110 Broadway Street, Suite 300
San Antonio, TX 78205
(210) 224-5476
Fax: (210) 224-5382
* Applications for admission pending

*Counsel for Plaintiff Naomi Peña Villasano*

## **CERTIFICATE OF CONFERENCE**

Pursuant to Local Civil Rule 7.1, the undersigned counsel hereby certifies that on May 23, 2023, she sent an email to counsel for the Garfield County School District 16 seeking to confer on the instant motion.  Counsel for the Garfield County School District 16 had, on May 15, 2023, acknowledged receipt of Plaintiff's demand letter and instructed the undersigned counsel to "direct further communication from your office on this matter to me."

On May 24, 2023, at 10:04 AM Mountain Time, counsel for Defendants responded that the Garfield County School District 16 opposes the instant motion and objects to it being heard *ex parte*.  At 10:12 AM, the undersigned counsel requested that counsel for the Garfield County School District 16 confirm that they would accept service by email of the complaint, TRO motion and supporting documents.   Counsel for the Garfield County School District 16 responded at 10:42 AM that they "need to see what you are filing and know where you are filing it before making that decision."  The undersigned counsel responded at 11:27 AM that Plaintiff would file her lawsuit in the U.S. District Court for the District of Colorado and would note the position of the Garfield County School District 16 in the certificate of conference.

On May 24, 2023, at 4:47 PM Mountain Time, the undersigned counsel emailed counsel for the Garfield County School District 16 an ECF-stamped copy of the complaint and civil action cover sheet.

/s/ Nina Perales
Nina Perales

24

**CERTIFICATE OF SERVICE**

Pursuant to Local Civil Rule 65.1, the undersigned counsel hereby certifies that she sent by email a true and correct copy of the above and foregoing, along with all supporting documents to this motion, to counsel for the Garfield County School District 16 immediately upon filing on the 24th day of May 2023.

*/s/ Nina Perales*
Nina Perales