**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 23-cv-01317-RMR

NAOMI PEÑA VILLASANO,

      Plaintiff,

v.

GARFIELD COUNTY SCHOOL DISTRICT 16;
LYNN J. SHORE, in his official capacity as President of the Garfield County School District 16
      Board of Education;
KIMBERLY S. WHELAN, in her official capacity as Vice-President of the Garfield County
      School District 16 Board of Education;
VINCENT T. TOMASULO, in his official capacity as Secretary/Treasurer of the Garfield
      County School District 16 Board of Education;
STACI R. MCGRUDER, in her official capacity as a Director of the Garfield County
      School District 16 Board of Education;
KEITH GRONEWOLLER, in his official capacity as a Director of the Garfield County
      School District 16 Board of Education;
JENNIFER BAUGH, in her official capacity as Superintendent of Garfield County School
      District 16; and
KELLY MCCORMICK, in his official capacity as Principal of Grand Valley High School,

      Defendants.

---

**ORDER DENYING TEMPORARY RESTRAINING ORDER**

---

This matter comes before the Court[1] on the Emergency Motion for Temporary Restraining Order and Request to Allow Out-of-State Counsel to Participate Virtually in a Hearing on this Motion ("Motion" or "Motion for Temporary Restraining Order") [Doc. 3, filed May 24, 2023] by

---

[1] Due to the unavailability of the presiding judge, the Honorable Regina M. Rodriguez, this Motion is before the undersigned pursuant to the Memorandum of referral dated May 25, 2023. [Doc. 5].

Plaintiff Naomi Peña Villasano ("Plaintiff" or "Naomi").[2]  The Court granted the request to permit out-of-state counsel to participate virtually in the hearing on May 25, 2023, but reserved ruling on the remainder of the Motion.  [Doc. 12].  The Court convened a hearing on the Motion on May 26, 2023, to hear argument on Plaintiff's request for a temporary restraining order.  Upon review of the Motion, the arguments made by the Parties, and the applicable case law, this Court respectfully **DENIES** the reserved portion of the Motion for Temporary Restraining Order.

## BACKGROUND

The following facts are drawn from the Verified Complaint for Injunctive and Declaratory Relief ("Verified Complaint") [Doc. 1]; the Declaration of Naomi Peña Villasano [Doc. 3-1]; the Declaration of Dr. Jennifer Baugh, Superintendent of Garfield County School District 16 ("Defendant Baugh" or "Superintendent Baugh") [Doc. 13-1]; and evidence in the record of which the authenticity is undisputed.

Naomi is a high school senior who attends Grand Valley High School in Defendant Garfield County School District 16 ("Defendant School District" or "School District").  [Doc. 3-1 at ¶ 3]. Her parents immigrated to the United States from Mexico.  [*Id.* at ¶ 4].  Her maternal grandfather, who helped raise her and with whom she is very close, is from Ocotlán, Jalisco, Mexico.  [*Id.*]. Naomi was born and raised in the United States, and identifies as Mexican American.  [Doc. 1 at ¶¶ 27, 30].  As a Grand Valley High School senior, she is set to graduate on May 27, 2023.  [Doc. 3-1 at ¶ 3].

---

[2] While this Court generally does not refer to individuals by their first name, it uses "Naomi," rather than "Ms. Peña Villasano" because her pleading and Motion does the same.

In March 2023, Naomi discussed with another student during her advisory class at Grand Valley High School the possibility of wearing a sarape-style[3] sash at graduation to reflect her heritage.  [Doc. 3-1 at ¶ 5].  Naomi's advisory teacher advised her that she could not wear that type of sash per a rule of Defendant Kelly McCormick, Principal of Grand Valley High School ("Defendant McCormick" or "Principal McCormick").  [*Id.*; Doc. 3-1 at ¶ 5].  On April 5, 2023, Naomi received a letter addressed to Seniors, setting out Grand Valley High School's rules with respect to decorating graduation caps.  [Doc. 3-1 at ¶ 6].  Those rules provide, inter alia, that:

> It is appropriate to put the following on your cap.
> ● Thank a parent, grandparent, teacher, friend
> ● Recognize the university you will be attending
> ● your graduation year
> ● the branch of the military you will be joining
> ● flag of a country as recognized by the the [sic] United Nations

[*Id.* at 7].  The letter did not address sashes, leis, or other regalia worn with or on graduation gowns. *See* [*id.*].

The following day, Naomi went to Principal McCormick's office to ask about the school's policy regarding her proposed sash, and was told by Principal McCormick's secretary that she would not be permitted to wear a sarape-style sash she was considering.  [*Id.* at ¶ 7].  On April 7, 2023, Naomi's sister-in-law, Alondra Loya ("Ms. Loya"), contacted Principal McCormick about Naomi's desire to wear a sarape-style sash for graduation.  [*Id.* at ¶ 9].  Principal McCormick again affirmed the decision that Naomi would not be permitted to wear a sarape-style sash at graduation. [*Id.*].  Principal McCormick also offered to connect Naomi and her family with Dr. Baugh about her request to wear a sarape-style sash.  [*Id.*].

---

[3] A "sarape" is defined as "a colorful woolen shawl worn over the shoulders especially by Mexican men."  *Sarape*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/sarape (last visited May 26, 2023).

On April 13, 2023, Naomi and Ms. Loya communicated with Dr. Baugh with respect to Naomi's desire to wear a graduation sash reflecting the Mexican and American flags.  [Doc. 3-1 at ¶ 9; Doc. 13-1 at ¶ 7].  Dr. Baugh indicated that Naomi could not wear her sash (mistakenly identified as a pin) because if the School District permitted the wearing of a flag of a country's nationality, "there are at least three flags that would be offensive to people because of what they represent in the past and current history."  [Doc. 3-1 at 9].  In that correspondence, Dr. Baugh indicated that sashes or cords worn during graduation typically represent membership in a nationally recognized organization; other distinctions such as class honors; future military service; or "regalia that is part of a Native American or Pacific Islander tribe."  [*Id.*]; *see also* [Doc. 13-1 at ¶ 4].  In her Declaration, Dr. Baugh states that "the School District was prepared on April 13, 2023 to work with Ms. Villasano to bring the question of expressing students' culture and heritage in the graduation ceremony to the senior class for their thoughts and wishes within an inclusive and a democratic process."  [Doc. 13-1 at ¶ 7].  However, the Parties did not engage in such a process.

On April 19, 2023, Naomi's brother gifted her a sarape-style sash that displays both the American flag and the Mexican flag, and bears the words "Class of 2023."  [Doc. 3-1 at ¶ 11].  On May 3, 2023, Naomi, her mother, and Ms. Loya met with Superintendent Baugh in hopes of securing permission for Naomi to wear her sash.  [*Id.* at ¶ 13].  Superintendent Baugh denied Naomi's request to wear the sash during graduation, but acknowledged that the School District permits regalia that is part of a Native American or Pacific Islander tribe.  [*Id.*].  Naomi then met with Superintendent Baugh and Defendant Lynn J. Shore, the President of the Board of Education ("Defendant Shore" or "President Shore").  [*Id.* at ¶ 14].  At that meeting, Superintendent Baugh

and President Shore declined to approve of Naomi's sash based on a School District prohibition. [*Id.*].

Defendants do not claim the School District has *written* rules with respect to sashes and cords associated with graduation regalia, and the only rules provided to Naomi were with respect to graduation caps. *See* [Doc. 3-1 at 7]; *see also* [Doc. 13-1 at ¶¶ 4–5]. It is also undisputed that the Board of Education Policy IKFB entitled "Graduation Exercises" does not address graduation regalia, including but not limited to sashes and cords. *See* [Doc. 3-2 at 26]. According to Dr. Baugh, the School District exercises "control over the content of the [graduation] program, the speeches, and the participating students' dress and decorum." [Doc. 13-1 at ¶ 3]. She explains that "[t]he School District's rule against personal sashes during the graduation ceremony is grounded in several concerns, including its interest in avoiding opening doors to speech that could offend others during a solemn, important ceremony in many families' lives." [*Id.* at ¶ 5]. She also represents that "[r]estricting the regalia also reserves recognition to future military service, academic distinction, or school-sponsored activities," and "having consistent regalia demonstrates and encourages unity of the student body" because the "graduation ceremony is for all students, not just one." [*Id.*]. Moreover, Dr. Baugh notes that the "graduation ceremony is steeped in symbolic traditions that signify the graduates' academic accomplishments and service to the community" and it reflects "local community values and decisions and an expression of pride in the graduates' accomplishments and future endeavors." [*Id.* at ¶ 7].

On May 15, 2023, Naomi, through counsel, requested the School District's Board of Education members and Superintendent Baugh permit her to wear her sash as she participates in the Grand Valley High School graduation ceremony. [Doc. 1 at ¶ 43]. The following day, Naomi attended a regularly scheduled Board of Education meeting to advocate for permission to wear the

sash at graduation.  [*Id.* at ¶ 44].  At the end of the meeting, President Shore stated that the School District's rules regarding cultural regalia would remain in effect and be fully enforced at the 2023 Grand Valley High School graduation ceremony, but that the School District would review its regalia rules during the 2023–2024 school year.  [*Id.* at ¶ 45].  This action followed.

In her Verified Complaint, Plaintiff asserts three causes of action against the School District and the following individuals in their official capacities:  President Shore; Kimberly S. Whelan, Vice President of the Garfield County School District 16 Board of Education; Vincent T. Tomasulo, Secretary/Treasurer of the Garfield County School District 16 Board of Education; Staci R. McGruder, Director of the Garfield County School District 16 Board of Education; Keith Gronewoller, Director of the Garfield County School District 16 Board of Education; Superintendent Baugh; and Principal McCormick (collectively, "Defendants").  First, pursuant to 42 U.S.C. § 1983, Plaintiff asserts that Defendants' unwritten rule prohibiting her from wearing her Mexican American sash but permitting students to wear sashes celebrating membership in a "Native American or Pacific Islander tribe" or entry "into a military service" violates the First Amendment and Fourteenth Amendments of the United States Constitution as impermissible viewpoint-based regulation of speech ("Count I").  [*Id.* at ¶¶ 54–57].  Second, Plaintiff alleges that the School District's rule violates Article II, Section 10 of the Colorado Constitution ("Count II").  [*Id.* at ¶¶ 58–60].  Third, Plaintiff contends that the District's prohibition of her sash, which depicts the American flag as well as the Mexican flag, violates Colo. Rev. Stat. § 22-32-109(1)(ii), which requires school districts to "adopt a policy . . . to ensure that the right of school district employees and students to display reasonably the flag of the United States shall not be infringed with respect to the display (I) On an individual's person; or (II) On an individual's personal property or property that is under the temporary control of an employee or a student, including but not limited to a desk

top or a locker" ("Count III").[4]   [*Id.* at ¶¶ 61–64].   On May 24, 2023, Naomi filed this instant Motion for Temporary Restraining Order.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the court to enter preliminary injunctions and issue temporary restraining orders.   Fed. R. Civ. P. 65(a), (b).   "The requirements for issuing a [temporary restraining order] mirror the requirements for issuing a preliminary injunction." *Briscoe v. Sebelius*, 927 F. Supp. 2d 1109, 1114 (D. Colo. 2013).   A party seeking preliminary injunctive relief must satisfy four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015).   A party seeking an injunction must demonstrate that "*all four* of the equitable factors weigh in its favor," *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013), and a "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014).   "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

The Parties agree that the Motion for Temporary Restraining Order seeks all the relief that Naomi could expect at trial.   Under authority from the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"), such a disfavored injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the

---

[4] The Board of Education Policy IMDB provides that "District employees and students have the right to reasonably display the flag of the United States on their own person, personal property, and/or property under their temporary control, such as a desk or locker."   [Doc. 3-2 at 28].

normal course." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004)); *Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1144 (D.N.M. 2020) (explaining that "[t]here are three disfavored injunctions: (i) mandatory (rather than prohibitory) injunctions; (ii) injunctions that change the status quo; and (iii) injunctions that grant all the relief that the moving party could expect to win at trial." (citing *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019))).  Accordingly, Plaintiff "must make a strong showing both on the likelihood of success on the merits and on the balance of the harms." *Colo. v. E.P.A.*, 989 F.3d 874, 884 (10th Cir. 2021) (quotation omitted).

## ANALYSIS

### I.      Likelihood of Success on the Merits

#### A.      Count I:  First Amendment Violation[5]

The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.  It is axiomatic that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  There is no dispute that the Grand Valley High School graduation is a school-sponsored event.  As relevant here, a public school's ability to restrict in-school speech—such as Naomi's decision to wear her sash during her graduation ceremony—consistent

---

[5] Although Plaintiff also identifies the Fourteenth Amendment as a basis for her claim, she does so insofar as the First Amendment is made applicable to the States by the Due Process Clause of the Fourteenth Amendment, not as a distinct violation of the Fourteenth Amendment.  *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996).

with the First Amendment depends largely on whether the speech is deemed private student speech or school-sponsored speech.  *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 36 (10th Cir. 2013); *see also Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045–47 (2021) (discussing standards for off-campus student speech).

*Private Speech.*  The Tenth Circuit defines private student speech as "[p]rivate student expression that is unconnected to any school-sponsored activity." *Taylor*, 713 F.3d at 36.  Private student speech is subject to enhanced protection under the Supreme Court's cases.  Such speech may not be restricted "unless the school reasonably forecast[s] that the speech would cause substantial disruption to the school environment" and, even then, such restriction must be viewpoint neutral.  *See id.* at 36, 46; *see also Tinker*, 393 U.S. at 514.

*School-Sponsored Speech.*  In contrast, where "students, parents, and members of the public might reasonably perceive [the speech] to bear the imprimatur of the school," it is considered school-sponsored speech.  *Taylor*, 713 F.3d at 36 (quoting *Morse v. Frederick*, 551 U.S. 393, 405 (2007)).  Schools may restrict school-sponsored speech, "provided the restrictions 'are reasonably related to legitimate pedagogical concerns.'" *Id.* (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)).  Moreover, restrictions on school-sponsored speech need not be viewpoint neutral.  *See Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 926–29 (10th Cir. 2002).

In distinguishing these two types of in-school speech, the Tenth Circuit directs courts to focus on "the level of involvement the school had in organizing or supervising the contested speech." *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1228 (10th Cir. 2009).  At the same time, "certain expressive activities may be closely tied to a school, yet not school-sponsored speech bearing the school's imprimatur." *Id.*  The Tenth Circuit has also described the distinction

as between "student speech that a school 'affirmatively . . . promote[s],' as opposed to speech that it 'tolerate[s].'" *Fleming*, 298 F.3d at 923 (quoting *Hazelwood*, 484 U.S. at 270–71).

### 1.    The Sash is School-Sponsored Speech

Naomi argues that wearing her sash at graduation is private speech, subject to enhanced protection, but as mentioned above, she does not dispute that the graduation ceremony is, itself, a school-sponsored event.   The determination whether wearing the sash is private or school-sponsored speech thus turns on (1) whether a student may engage in private student speech at a school-sponsored event; and (2) if so, whether Naomi's sash—the contested speech here— qualifies as private student speech.  Assuming without deciding that it is doctrinally possible to engage in private student speech at a school-sponsored event, the Court turns to consider "the level of involvement the school had in organizing or supervising the contested speech" at issue.  *Corder*, 566 F.3d at 1228.

At the outset, the Court recognizes that Naomi received the sash from her family and that any reasonable observer would believe that the sash "express[es]" Naomi's "Mexican American culture" and "Latino heritage," just as she intends.  [Doc. 3-1 at ¶¶ 5, 7].  This Court also recognizes that there is no suggestion that Naomi seeks to wear the sash, which depicts representations of the Mexican flag and the American flag, along with the words "Class of 2023," [*id.* at 12], with any malintent.  Nonetheless, the question before the Court is whether Naomi's speech also carries the School District's "imprimatur"—or, in other words, whether Naomi's speech may reasonably be viewed as the School District's because of the context in which it is delivered.

Although it is true that many pieces of regalia that complement the cap and gown are worn at the graduate's option, this Court finds that, in the context of Grand Valley High School's graduation ceremony, any such expression is subject to the School District's discretion and

supervision as a matter of course. *See Fleming*, 298 F.3d at 930–31 (tile decoration project organized by school constituted school-sponsored speech despite participants' expression in individual tiles). As stated in Superintendent Baugh's Declaration, the School District dictates nearly every aspect of its graduation ceremony. *See* [Doc. 13-1 at ¶ 3 ("The School District closely controls the graduation ceremony for students who complete the School District's academic program. This includes control over the content of the program, the speeches, and the participating students' dress and decorum.")]. The record reflects that the sashes and cords that are worn at Grand Valley High School's graduation are generally associated with school-related activities and distinctions, e.g., National Honor Society or class rank. [Doc. 3-1 at 9]. The School District's policy, albeit unwritten, provides exceptions to that general association for upcoming military service and regalia that is part of a Native American or Pacific Islander tribe. [*Id.*]. A sash worn by a graduating student at her graduation is connected with the school to any reasonable observer precisely because it is reasonably viewed as part of the graduate's regalia: a preplanned message communicated by both student and school in the context of the graduation ceremony. *See Corder*, 566 F.3d at 1229 (advanced control over content of graduation speech rendered it school-sponsored).

Indeed, Naomi's emphasis on the School District's decision to "allow[] some expressive sashes while prohibiting hers" is, for school-sponsored speech analysis, a recognition of the reality that, in practice, the School District controls the attire which graduates wear during the graduation ceremony. [Doc. 3 at 14]. Even with respect to the graduation caps, Grand Valley High School has explicit guidelines as to the expressive decorations, and "**reserve[s] the right to disallow anything that is not considered appropriate for commencement ceremony**." [Doc. 3-1 at 7]. These practices are, in turn, reasonably apparent to any graduation attendee facing a group of

similarly attired graduates at a ceremony that has been planned in detail by Grand Valley High School. *See Corder*, 566 F.3d at 1229 ("A high school graduation ceremony under these circumstances is 'so closely connected to the school that it appears the school is somehow sponsoring the speech.'" (quoting *Fleming*, 298 F.3d at 925)). The School District's Graduation Exercises guidance further reinforces this conclusion, as it permits students to organize "baccalaureate services that are religious in nature," but expressly notes that "the [S]chool [D]istrict shall not be identified, explicitly or implicitly, as sponsoring or endorsing such services." [Doc. 3-2 at 26]. In contrast, the school does not disclaim graduation attire at the graduation ceremony. Far from it, when a graduate dons regalia at a graduation ceremony, the message she sends "bear[s] the imprimatur of the school," *Taylor*, 713 F.3d at 36 (quotation omitted), and is speech that the school "promote[s]," *Fleming*, 298 F.3d at 923 (quotation omitted), so qualifies as school-sponsored speech, at least for the duration of the ceremony.[6]

> **2.     The School District's Rule is Reasonably Related to Legitimate Pedagogical Concerns**

Having concluded that wearing a sash as part of graduation regalia during a graduation ceremony is school-sponsored speech, the Court turns to whether the School District's restriction on Naomi's ability to do so is "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. Under governing precedent, that is not a demanding standard for the School District to meet. *See Fleming*, 298 F.3d at 931 (referencing "the broad umbrella that courts

---

[6] The Court's analysis is limited to the speech issues presented by attire involving or supplementing graduation regalia worn by graduating students during a graduation ceremony, such as sashes, cords, robes, mortar boards, and the like. That excludes speech by graduating students before and after the graduation ceremony, as the School District recognizes. *See* [Doc. 13 at 13 ("Ms. Villasano may also don her sash before and after the graduation ceremony.")]. Indeed, at oral argument, counsel for Defendants suggested that once Naomi received her diploma and her part of the graduation was completed, she would be free to wear the sash.

have given to pedagogical purposes").  Indeed, in the commencement context, the Tenth Circuit has specifically noted that "[a] graduation ceremony is an opportunity for" a school "to impart lessons on discipline, courtesy, and respect for authority."  *Corder*, 566 F.3d at 1229.  The School District invokes similar interests here, including unity, tradition, democratic change, and avoiding controversy.  *See* [Doc. 13 at 8–10].  The Court must credit the School District's asserted interests. *See Fleming*, 298 F.3d at 925 ("[W]e give substantial deference to educators' stated pedagogical concerns.").

Similarly, in *Ocansey v. Jefferson Cnty. Sch. Dist. R-1*, Case No. 98-M-1099, the plaintiffs brought three claims based on Arvada High School's explicit prohibition of their right to wear their Kente Cloths at the 1998 Arvada High School graduation ceremony:  (1) violation of the First and Fourteenth Amendments; (2) violation of Article II, § 10 of the Colorado Constitution; and (3) violation of their statutory rights as students attending public school as protected and preserved by Colo. Rev. Stat. § 22-1-120.  *See* [Doc. 15-1].  Defendants declined to allow the students to wear the Kente Cloths, citing the interest in the unity of the graduation ceremony at Arvada High School.  [Doc. 15-2].  Like the *Ocansey* court, this Court concludes that the unity purpose is a legitimate pedagogical interest.  *See* [Doc. 15-3 at 7].

Naomi stresses that the School District permits its graduates to wear sashes earned in connection with honors or school-affiliated organizations, as well as leis and other items of indigenous cultural expression.  However, certain of these items are only permitted pursuant to a state statute.  *See* Colo. Rev. Stat. § 22-1-142.  All others, the record reflects, are school-approved; indeed, the school-approval norm is central to the Court's conclusion that graduation regalia constitutes school-sponsored speech.  Even if that were not the case, the School District could freely permit one sash and prohibit another, as a general matter, because "*Hazelwood* allows

educators to make viewpoint-based decisions about school-sponsored speech." *Fleming*, 298 F.3d at 926. It is likewise immaterial to the pedagogical-concerns analysis that the School District's regalia policy is unwritten. *See Corder*, 566 F.3d at 1230.

To the extent that graduation regalia is school-sponsored speech, as the Court has found, the School District is permitted to restrict that speech as it sees fit in the interest of the kind of graduation it would like to hold. *See Bear v. Fleming*, 714 F. Supp. 2d 972, 988 (D.S.D. 2010) ("A graduation proceeding is a theatrical production in a sense—the actors, director, and stage crew, or rather the students, administrators, teachers, and staff members, hope to convey a message the audience will understand and appreciate."); *see also Griffith v. Caney Valley Pub. Schs.*, 157 F. Supp. 3d 1159, 1164 (N.D. Okla. 2016) (concluding that high school graduation "dress policy . . . promotes unity, discipline, and respect for authority, and allows the school to reserve special recognition for student achievement or participation in school-related activities"). Under *Hazelwood*, it is not the Court's role to override the School District's judgment as to the values furthered by its graduation ceremony, subject the efficacy of the School District's pursuit of those values to heightened scrutiny, or interrogate every facet of the School District's approach to graduation attire to see if it passes muster. And even Naomi acknowledges the varied values that are at issue. *See* [Doc. 3 at 15 (recognizing the School District's "potential interests" in "promoting unity, honoring tradition, and avoiding controversy" but arguing that they would not satisfy strict scrutiny)]. The Court therefore respectfully agrees with the School District that graduation regalia, just like graduation speeches, can be editorially restricted consistent with *Hazelwood* as part of the presentation of graduates at a graduation ceremony. *See Corder*, 566 F.3d at 1229–30. Naomi's sash, which would become part of her regalia if worn over her robe at the graduation ceremony, falls under that framework.

Finally, this Court in no way diminishes the sincerity, value, or importance to Naomi of expressing that she is "a 200 percenter—100% American and 100% Mexican." [Doc. 1 at ¶ 44]. Although it "would be abdicating [its] judicial duty if [it] failed to investigate whether the educational goal or pedagogical concern was pretextual," a court will not otherwise "second-guess the pedagogical wisdom or efficacy of an educator's goal." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292–93 (10th Cir. 2004) (emphasis omitted). Here, Naomi does not allege that the School District's sash policy is pretextual, either as a general matter or as applied to her. Indeed, her counsel conceded at oral argument that she is not alleging any racial animus on the part of the School District. It is undisputed, for example, that the School District will permit Naomi to adorn her mortar board with a Mexican flag. Thus, based on the record before it, the Court does not find that any of the School District's stated pedagogical concerns are pretextual.

Because the School District's restriction on Naomi's sash is reasonably related to legitimate pedagogical concerns, the Court concludes that the restriction passes *Hazelwood* scrutiny and Naomi has failed to carry her heavy burden of establishing that there is a strong likelihood of success on the merits of her First Amendment claim.

### B.     Counts II and III: State Law Claims

At the outset, it is unclear whether the Court would ultimately retain jurisdiction over Naomi's state law claims under Counts II and III in light of the conclusion above that Naomi has not met her burden of establishing the likelihood of success as to her First Amendment claim under Count I. *See, e.g.*, *Sandberg v. Englewood*, 727 F. App'x 950, 965 (10th Cir. 2018) ("Our conclusion that the district court correctly dismissed Sandberg's § 1983 claims removes any basis for federal jurisdiction in this case. Since the district court only had supplemental jurisdiction over the Colorado Constitution claim, the dismissal of all federal causes of action means the federal

court should decline the exercise of jurisdiction by dismissing the case without prejudice." (citations and internal quotation marks omitted)); *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998) (stating that once "the bases for federal subject matter jurisdiction have been extinguished . . .[,] the district court may decline to exercise continuing [pendent] or supplemental jurisdiction over plaintiff's state claims"). Nevertheless, as explained below, the Court finds that Naomi has not established she is likely to succeed on her claims under Counts II or III.

### 1.     Count II: Violation of the Colorado Constitution

Under Count II, Naomi alleges that Defendants violated her right to free speech under Article II, Section 10 of the Colorado Constitution. [Doc. 1 at ¶¶ 58–60]. In *Arndt v. Koby*, 309 F.3d 1247 (10th Cir. 2002), the Tenth Circuit held that a plaintiff could not pursue a claim for a violation of the Colorado Constitution's free speech provision because the First Amendment covered the same conduct, and she could seek relief under § 1983 for a First Amendment violation. *Id.* at 1255 (citing *Bd. of Cnty. Comm'rs v. Sundheim*, 926 P.2d 545, 553 (Colo. 1996) (en banc)); *see also Sandberg v. Englewood*, 727 F. App'x 950, 964 (10th Cir. 2018) ("As the district court noted, Sandberg can only pursue a claim for a violation of Colo. Const. art. II, § 13 if that provision is distinct from the Second Amendment."); *Sundheim*, 926 P.2d at 553 ("While it may be appropriate to recognize an implied state constitutional cause of action when there is no other adequate remedy, we agree . . . that where other adequate remedies exist, no implied remedy is necessary.").

Naomi acknowledges that her claim under Count II is based on the same conduct underlying her First Amendment claim under Count I. *See, e.g.*, [Doc. 3 at 19 ("For the reasons expressed above in Section III.A.1.a, Naomi's sash constitutes private student speech that the

District has improperly restricted under Article II, Section 10 of the Colorado Constitution—consistent with the greater protections of that provision.")].  Moreover, at the hearing on the instant Motion, Naomi's counsel conceded that her First Amendment claim under Count I provides an adequate remedy for the relief that Naomi seeks with respect to her claim under Count II.

Accordingly, in light of the Court's conclusion above that Naomi has not met her heavy burden of establishing the likelihood of success as to her First Amendment claim under Count I, this Court also finds that Naomi has not met her burden of establishing the likelihood of success with respect to her claim under Count II.

### 2.    Count III: Violation of Colo. Rev. Stat. § 22-32-109(1)(ii)

The Court also finds that Naomi has not demonstrated a likelihood of success for her claim under Count III alleging violation of Colo. Rev. Stat. § 22-32-109(1)(ii).  The statute provides that each school district's board of education shall "adopt a policy . . . to ensure that the right of school district employees and students to display reasonably the flag of the United States shall not be infringed with respect to the display: (I) On an individual's person; or (II) On an individual's personal property or property that is under the temporary control of an employee or a student, including but not limited to a desk top or a locker[.]"  Colo. Rev. Stat. § 22-32-109(1)(ii).

Notably, however, Naomi does not cite—and the Court's independent research did not reveal—any authority to support that a private right of action exists under the statute.  *See generally* [Doc. 1; Doc. 3].  The Colorado Supreme Court has explained that when a statute "is totally silent on the matter of remedy," then the court "must determine whether a private civil remedy reasonably may be implied" by examining various factors.  *See Taxpayers for Pub. Educ. v. Douglas Cnty. Sch. Dist.*, 351 P.3d 461, 467 (Colo. 2015).  But Naomi does not substantively analyze and establish that such a private right of action would accrue under Colo. Rev. Stat. § 22-32-109(1)(ii), *see* [Doc.

3 at 20], and her counsel did not address Count III during oral argument. This Court is not persuaded, based on the authority before it, that such a right exists. Thus, Naomi has not met her burden to establish her likelihood of success in arguing (1) that a private right of action exists such that she has standing to assert a claim under Colo. Rev. Stat. § 22-32-109(1)(ii), or (2) that her claim under Count III would be likely to succeed. *See* [Doc. 3].

## II.   Irreparable Harm and Remaining Factors

Having found no likelihood of success on the merits of any of Naomi's claims, the Court need not consider the remaining requirements for granting preliminary relief at great length. *See Abay v. Denver*, 445 F. Supp. 3d 1286, 1291 (D. Colo. 2020) (citing *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)) ("In cases in which the deprivation of constitutional rights is at issue, the likelihood of the success on the merits factor is determinative."). Regarding irreparable harm, Naomi correctly points out in her Motion that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." [Doc. 3 at 21 (quoting *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016)]. As explained above, however, the Court finds no likelihood of success on the merits of Naomi's First Amendment claim, and in turn, no basis for irreparable harm on that ground.

Naomi also argues that "[h]igh school graduation happens once" and if she "must choose between losing her ability to express her culture and losing the opportunity to cross the graduation stage and receive her diploma in front of her family and community, she will be irreparably harmed." [*Id.*]. In its Response, the School District takes the position that it is not preventing Naomi from expressing her culture; rather, it is channeling Naomi's expression of her culture onto her mortar board. *See* [Doc. 13 at 13]. The School District's mortar board policy expressly states that "[i]t is appropriate" to decorate a cap with the "flag of a country as recognized by the . . .

United Nations." [Doc 3-1 at 7]. That policy would permit Naomi to reproduce the design of the sash on her regalia. Further, the School District acknowledges that Naomi may wear the sash before and after the graduation ceremony. [Doc. 13 at 13]. While Naomi may prefer to wear the sash during the graduation ceremony, the Court respectfully agrees with the School District and concludes that Naomi will not suffer irreparable injury by having to express her culture in a form other than the sash.

Without a showing of irreparable harm, the court need not balance the harms or evaluate the public interest in depth. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). The Court therefore respectfully concludes that, at this stage of the proceedings, Plaintiff is unable to sufficiently demonstrate a right to the disfavored relief she seeks.

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** that:

(1)     Plaintiff's Emergency Motion for Temporary Restraining Order and Request to Allow Out-of-State Counsel to Participate Virtually in a Hearing on this Motion [Doc. 3] is **GRANTED IN PART AND DENIED IN PART**. The request for a temporary restraining order is **DENIED**.

DATED: May 26, 2023                    BY THE COURT:

 

_____
Nina Y. Wang
United States District Judge